**IT IS SO ORDERED.**

**Dated: 18 June, 2025 04:19 PM**

Suzana Krstevski Koch

**Suzana Krstevski Koch**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| KIM MARIE CATANZARITE, | ) | Case No. 23-13151 |
| | ) | |
| Debtor. | ) | Judge Suzana Krstevski Koch |
| | ) | |
| | ) | |
| JOHN REWAK, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | No. 24-1006 |
| v. | ) | |
| | ) | |
| KIM MARIE CATANZARITE, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>MEMORANDUM OF OPINION AND ORDER</u>

This adversary proceeding is before the Court on Plaintiff John Rewak's ("Rewak")

Complaint (ECF No. 1) pursuant to 11 U.S.C. §§ 523 (a)(2)(A) and (a)(6)[1], and Defendant

Debtor Kim Marie Catanzarite's ("Catanzarite") Answer to Complaint ("Response"). ECF No.

---

[1] At the November 14, 2024 Trial, Rewak withdrew his 11 U.S.C. § 523(a)(6) claim. As a result, this Memorandum of Opinion addresses only the 11 U.S.C. § 523(a)(2)(A) claim.

11. The Court held an evidentiary hearing (the "Trial") on November 11, 2024. Rewak, Catanzarite, and their respective counsel attended the Trial, and presented testimony and other evidence in support of their respective positions regarding the dischargeability of Catanzarite's debts to Rewak. At the conclusion of the Trial, the Court requested the parties provide post-trial briefing. For the reasons below, the Court finds $46,845.87 of Catanzarite's debt to Rewak to be nondischargeable.

## JURISDICTION

The Court has jurisdiction over Catanzarite's underlying Chapter 7 case and this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and Local General Order 2012-07 of the United States District Court for the Northern District of Ohio. Actions to determine dischargeability are core proceedings that this Court may hear and determine under 28 U.S.C. § 157(b)(2)(I). Venue in this Court is proper under 28 U.S.C. § 1409. The following constitutes the Court's findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, made applicable to this contested matter by Rule 9014 of the Federal Rules of Bankruptcy Procedure. *See e.g.*, *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 710 (6th Cir. 1999). The Court has examined all of the submitted materials, weighed and observed the demeanor and credibility of the witnesses, carefully considered all the evidence, and reviewed the entire record of the case in determining the facts pertinent to the case and drawing conclusions thereof. *See e.g.*, *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005) (explaining that, in making its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, a court should consider "the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, . . ."). The following are the Court's findings of facts from the pleadings, and the testimony and evidence presented at the Trial.

2

# FACTUAL BACKGROUND

## A. The Relationship

From around 2003 to 2015, Rewak and Catanzarite were romantic partners. ECF No. 38, ¶ 2; ECF No. 39. Rewak was employed at U.S. Steel Corporation in Lorain, Ohio, and Catanzarite was employed at Invacare. Trial Tr. 15:12, 18. Catanzarite has two adult children, Kristi Jones ("Jones") and Brandon Kalo ("Kalo"). *Id.* 72:13–16. Beginning in 2006, Rewak and Catanzarite entered into a series of financial transactions which were all for the benefit of Catanzarite and her children. The nature of five specific transactions between the parties is now the focus of this case. In summary, the following transactions are at issue:

1. On March 10, 2006, Rewak issued a check payable to Catanzarite in the amount of $1,200.00 (Pl.'s Ex. 201) to pay for Jones' upcoming auto insurance payment (the "Auto Insurance Payment");

2. On August 9, 2006, Rewak issued a check payable to Catanzarite in the amount of $6,400.00 (Pl.'s Ex. 202) to pay for veneers obtained by Catanzarite (the "First Dental Payment");

3. On March 20, 2007, Rewak issued a check payable to Catanzarite in the amount of $2,000.00 (Pl.'s Ex. 203) to pay for additional dental work (the "Second Dental Payment");

4. On September 1, 2007, Rewak issued a check payable to Catanzarite in the amount of $25,000.00 (Pl.'s Ex. 205) to help Catanzarite, Jones, and Kalo with a real estate venture (the "Real Estate Payment"); and

5. On March 16, 2010, Rewak issued a check payable to Liberty Auto Group (a local auto dealership) in the amount of $23,345.37 (Pl.'s Ex. 207) to pay for a 2010 Lincoln

Mercury for Catanzarite (the "Lincoln Mercury Payment") (together with the Auto Insurance Payment, the First Dental Payment, the Second Dental Payment, and the Real Estate Payment, the "Transactions").

By 2015, the romantic relationship ended. Trial Tr. 15:2, 87:8. Rewak argues that the Transactions were "loans" for which he expected to be repaid (at least in part) from a trust that Catanzarite told him she could access. Catanzarite considers the Transactions to be "gifts."

### B. Summary of the Trust

There is no document entered into evidence that is a trust document. Rewak testified that he saw what he believed to be a trust document, and there is ample and credible testimony that Rewak believed in the existence of a funded trust within which Catanzarite had an interest or, at least, to which Catanzarite had access. *Id.* 16:16–17, 20:8–10. Rewak testified that "because of the nature and the level of [their] relationship, [he] was not worried because [he] knew there was money. . . ." *Id.* 28:7–11. Rewak further testified that "during [his] discussions with [Catanzarite], [he] was made aware there was close to around a $200,000.00 balance" (*Id.* 44:10–11) in a trust and that he "always felt secure that she had the capability of taking money from the fund to pay the loans." *Id.* 44:14–16.

Catanzarite testified that when her son died, a $250,000.00 "trust" was funded for the benefit of Jones. *Id.* 73:1, 84:6. The record is not clear: when Catanzarite's son died (but it was before 2008); as to the nature of the "trust;" how exactly the funds were to be accessed; whether the funds were life insurance proceeds; or what many terms of the "trust" were. The record is clear, though, that Catanzarite told Rewak about a trust (the "Trust"). *Id.* 28:7–17, 79:10. Catanzarite testified that Jones was the named beneficiary of the Trust, there was some money in the Trust, the Trust would be accessible when Jones turned 25 in 2008, and Catanzarite could

apply to the Lorain County Probate Court for funds from the Trust. *Id.* 82:2–4, 84:4–17. In her cross examination, Catanzarite confirmed that Rewak was "aware of a trust fund" in Jones' name, stating: "Yeah. It was mentioned." *Id.* 72:21.

### C. The State Court Litigation

On August 16, 2017, Rewak commenced an action against Catanzarite in Lorain County Common Pleas Court (the "State Court").[2] Rewak alleged Catanzarite committed (1) breach of contract; (2) unjust enrichment; and (3) fraud. The State Court allegations involved the Transactions. The State Court case proceeded to a bench trial before a magistrate. The magistrate heard testimony from the parties, and documents were submitted into evidence. On August 18, 2021, the State Court rendered its judgment, summarizing:

> There is no dispute as to the timing or the dollar amounts of the monies that went from Rewak to Catanzarite and Jones from 2006 to 2010. Moreover, the manner in which the funds were utilized was also undisputed: No. 1 was for the auto insurance of Jones; No. 2 was for dental work of Catanzarite; No. 3 was used for additional dental work for Catanzarite; No. 4 was evidenced by a written 'IOU' signed by both Jones and Catanzarite. . . . Those funds were ostensibly used for the rehab of a single-family residence that Jones and her brother, Kalo, were to 'flip' . . . . Finally, the No. 5 advance was for the purchase of a new car for Catanzarite.
>
> . . .
>
> This case came to trial based upon a dispute by the parties as to whether the amounts advanced by Rewak were all loans by Rewak with the intention of being repaid after Catanzarite and Rewak were no longer a romantic couple.

Pl.'s Ex. 207, at 3.

Regarding the unjust enrichment claim, the State Court found judgment in favor of Rewak and against Catanzarite, "inasmuch as she was unjustly enriched. . . ." *Id.* at 10. The

---

[2] The State Court case (17CV193130) was originally filed on August 16, 2017 naming Catanzarite and her two adult children, Jones and Kalo. The case was dismissed without prejudice on June 11, 2019. The case was subsequently refiled on July 26, 2019, this time against Catanzarite and Jones.

State Court rendered "a total judgment in favor of [] Rewak and against [] Catanzarite, on the [] claim of unjust enrichment, in the amount of $31,745.87 plus post judgment interest." *Id.*

Regarding the breach of contract claim, the State Court found judgment in favor or Rewak and against Catanzarite and Jones, "jointly and severally, in the amount of $25,000.00 plus prejudgment interest. . . ." *Id.* at 13.

Regarding the fraud claim, the State Court compared its factfinding against the standard for fraud under Ohio common law and found that Rewak's "fraud claim was not pled with sufficient particularity" and "the trial testimony, too, did not establish any fraud on the part of either Jones or Catanzarite." *Id.* at 5.

### D. Catanzarite's Bankruptcy

On September 11, 2023, Catanzarite filed a Petition for Relief under Chapter 7 of Title 11 United States Code (Case No. 23-13151). ECF No. 1. Catanzarite's petition lists Rewak as a creditor with two secured claims. *Id.* The first in the amount of $31,745.87 (the State Court unjust enrichment judgment), the second in the amount of $25,000.00 (the State Court breach of contract judgment), and both claims secured by real property at 2433 E. 35th Street Lorain, Ohio. *Id.* Catanzarite's petition also names Rewak as a creditor with an unsecured claim in the cumulative amount of $56,745.87. *Id.*

### E. The Adversary Proceeding and Trial

On January 15, 2024, Rewak filed his Complaint under § 523(a)(A)(2), claiming that "[b]etween March 2006 and March 2010," he paid to Catanzarite a total sum of $56,745.87 (ECF No. 1); that those "payments were based upon false representations" (*Id.*, ¶ 8); and that he "relied on such representations by [Catanzarite] in providing funds." *Id.* Rewak says Catanzarite "represented that there were funds available in [the Trust] fund accessible to [her] to repay the loan[s]." *Id.* ¶ 10. Rewak asks the Court to find that the State Court judgment ($31,745.87 for unjust enrichment and $25,000.00 for beach of contract, plus interest) be deemed nondischargeable under § 523(a)(2)(A) because the debts were acquired by "false pretenses, false representations, and actual fraud."[3] *Id.*, ¶ 13

Catanzarite's Response denies all dispositive claims in Rewak's Complaint (ECF No. 11, ¶¶ 2, 4) and asks that the Court "dismiss the action . . . and award judgment in his [sic] favor and award all attorney's fees in defending this action as well as costs incidental hereto." *Id.*

The parties presented evidence and made arguments for their respective positions on the § 523(a)(2)(A) issue at Trial on November 14, 2024. Rewak and Catanzarite were the lone individuals to testify on direct and cross examination, and the Court admitted exhibits provided by Rewak into evidence.

---

[3] The parties used false representation and misrepresentation interchangeably throughout the pleadings and the Trial. This Memorandum and Opinion will apply the terms "false pretenses" and "false representation" as used in § 523(a)(2)(A).

At Trial, Rewak's opening argument alleged that Catanzarite's "false pretenses and false representations" were both "implied and direct misrepresentations . . . includ[ing] that [] Catanzarite had an interest in the [T]rust held by her daughter, that there was money in that [T]rust, that the [T]rust would be accessible . . . around 2008 . . . and that the money would be paid at that time." Trial Tr. 5:4–15. It was "based upon those representations" argued Rewak, "that he made the loan, and extended credit in this matter." *Id.* 5:19–22. Regarding the issue of collateral estoppel, Rewak argued that "for various reasons, [] the issue [of fraud] wasn't actually and directly litigated" at the State Court, so collateral estoppel should not apply. *Id.* 6:7–9.

Catanzarite's counsel countered that the evidence does not show "that there was any fraud or false pretenses." *Id.* 103:2–3. Regarding the collateral estoppel issue, Catanzarite's counsel contended that the State Court's judgment was for "both breach of contract and unjust enrichment" (*Id.* 7:1–2) and those "are dischargeable debts." *Id.* 7:13. Catanzarite's counsel further asserted that collateral estoppel applies because "the State Court clearly ruled that there was no fraud, and there was no evidence of fraud." *Id.* 7:15–17.

At the conclusion of the Trial, the Court compared the Ohio standard for a fraud claim against the § 523(a)(2)(A) standard and found that "collateral estoppel *does* apply" (*Id.* 105:7–22) in this case as it relates to fraud. Thus, because the State Court found no fraud existed, the Court is estopped from determining the fraud element of § 523(a)(A). *Id.* 104:1. The Court further explained that even if it were to have jurisdiction to rule on the question of fraud, Rewak did not present sufficient evidence to make such a finding.

The Court determined that same cannot be said, however, regarding the elements for false pretenses and false representation. The Court asked the parties to file post-trial briefs on the narrow issues of false pretenses and false representation within § 523(a)(2)(A). *Id.* 106:24–107:1. The parties submitted their respective post-trial briefs on April 8, 2025. ECF Nos. 38, 39.

## LAW AND ANALYSIS

I.   **Nondischargeability in Bankruptcy**

The Bankruptcy Code affords a "fresh start" only to "the honest but unfortunate debtor." *Stamper v. United States (In re Stamper)*, 360 F.3d 551, 557 (6th Cir. 2004) (citing *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). To achieve that end, 11 U.S.C. § 727(b) affords a discharge to those debtors who file a petition for relief under Chapter 7, relieving them of all debts incurred prior to the filing of a petition for bankruptcy, so long as those debts are not subject to certain exceptions listed in § 523 of the Bankruptcy Code. Simply put, a "fresh start" is not without its limits. *See Bartenwerfer v. Buckly*, 598 U.S. 69, 71 (2023) ("[T]he Bankruptcy Code is not focused on the unadulterated pursuit of the debtor's interest, and instead seeks to balance multiple, often competing interests."); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) ("When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.").

Rewak seeks a determination that the debt owed him by Catanzarite is nondischargeable under § 523(a)(2)(A), which provides:

> (a) Discharge under [§ 727] does not discharge an individual debtor from any debt –
> (2) For money . . . to the extent obtained by . . .
>     (A) false pretenses, a false representation, or actual fraud . . . ;

11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) is phrased in the disjunctive so it describes three distinct categories of debtor misconduct that will give rise to a nondischargeable debt (false pretenses, a false representation, or actual fraud). 11 U.S.C. § 523(a)(2)(A). As the statute is framed in the disjunctive, "a showing of only one of the offending conducts is required." *Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir. 1998).

In an adversary proceeding challenging the dischargeability of a debt, the plaintiff has the burden of proof at trial on the substantive issues as prescribed by § 523(a)(2)(A). The applicable evidentiary standard to satisfy this burden is a preponderance of the evidence standard. *Grogan*, 498 U.S. at 291; *see also Hart v. Molino (In re Molino)*, 225 B.R. 904, 907 (B.A.P. 6th Cir. 1998); *AmeriCredit Fin. Servs. v. Valentine (In re Valentine)*, No. 07-61503, 2008 LEXIS 1236, at *6 (Bankr. N.D. Ohio Apr. 23, 2008). By design, exceptions to discharge are strictly construed against the creditor and liberally in favor of the debtor. *In re Rembert*, 141 F.3d at 281; *Livingston v. Transnation Title Ins. Co, (In re Livingston)*, 372 F. App'x 613, 618 (6th Cir. 2010).

## A. Collateral Estoppel

Collateral estoppel prevents the relitigating of an ultimate fact that was determined by a valid and final judgment in a prior action. *Dowling v. United States*, 493 U.S. 342, 347 (1990). In *Grogan*, the Supreme Court held that collateral estoppel principles apply in bankruptcy cases

and can be used in nondischargeability actions to prevent relitigation of issues already decided. 498 U.S. at 279. Because the debt at issue is based on the State Court judgment, the Court's ultimate dischargeability determination is governed, in part, by factual issues decided by the State Court. *Spilman v. Harley*, 656 F.2d 224, 227–28 (6th Cir. 1981) ("[T]hat Congress intended the bankruptcy court to determine the final result [of] dischargeability . . . does not require the bankruptcy court to redetermine all the underlying facts." When the requirements are met, "collateral estoppel should preclude relitigation of factual issues.").

"The bankruptcy court, when asked to determine the potential application of collateral estoppel, must review the record of the state-court proceeding to determine if any factual issues relevant to dischargeability have been actually and necessarily determined by the state court." *Long v. Piercy (In re Piercy)*, 21 F.4th 909, 919 (6th Cir. 2021). When the issue previously litigated was litigated under state law, bankruptcy courts apply the law of collateral estoppel of the relevant state. *See Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 535 (Bankr. S.D. Ohio 2008).

"Ohio law recognizes two related concepts of preclusion under the doctrine of res judicata: claim preclusion, which is also known as res judicata or estoppel by judgment, and issue preclusion, which is also known as collateral estoppel." *In re Stepp*, No. 11-16121, 2013 Bankr. LEXIS 3793, at*9 (Bankr. N.D. Ohio Sept. 11, 2013); *see also State of Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011) (citing cases). The Sixth Circuit has determined that, under Ohio law, issue preclusion applies when the following four elements are met—known as the *Wilcox* elements:

> (1) A final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; (2) The issue must have been actually and directly litigated in the prior suit and must have been necessary in the final judgment; (3) The issue in the present suit must have been identical to the issue

in the prior suit; (4) The party against whom estoppel is sought was a party or in privity with the party to the prior action.

*Smith v. Lerner, Sampson & Rothfuss, L.P.A.*, 658 Fed. Appx. 268, 278–79 (6th Cir. 2016)

(citing *Murray v. Wilcox (In re Wilcox)*, 229 B.R. 411, 415–16 (Bankr. N.D. Ohio 1998)).

If the *Wilcox* elements are met, the Court is estopped from any further consideration of the issue.

### B. Fraud Under Ohio Common Law

The Ohio Supreme Court established that fraud consists of:

> (a) a representation, or where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to where it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland Inc.*, 514 N.E.2d 709, 712 (Ohio 1987).

As stated above, the State Court determined that Rewak's "fraud claim was not pled with sufficient particularity" and "the trial testimony, too, did not establish any fraud on the part of either Jones or Catanzarite." Pl.'s Ex. 207, at 5. At the Trial, the Court determined that collateral estoppel applied to fraud, therefore estopping a relitigating of the fraud issue—that *Wilcox* analysis is below. Additionally, because of the nature and similarity of the fraud elements to those of false representation and false pretenses, the same *Wilcox* analysis must be applied to each of the three disjunctive categories of fraud, false representation, and false pretenses.

### C. Fraud Under § 523(a)(2)(A)

The Supreme Court has established that "actual fraud" includes fraudulent transfers and "fraudulent conduct" that deals in "acts of concealment and hindrance." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 362 (2016). In *Ritz* the Supreme Court explained its approach to "actual fraud" in the § 523 context, stating: "anything that counts as 'fraud' and is done with wrongful

intent is 'actual fraud.'" *Id.* at 360 (holding that a fraudulent transfer scheme effectuated without any false representation to a creditor was within the § 523(a)(2)(A) exception to discharge). When compared with the Ohio common law elements of fraud (*see Gaines*, 514 N.E.2d at 712), the elements of fraud under § 523(a)(2)(A) were considered by the State Court.

At Trial, the Court determined that collateral estoppel applies to Rewak's § 523(a)(2)(A) fraud claim because the State Court already determined that Rewak did not establish there was any actual fraud on the part of Catanzarite. The Court is therefore estopped from determining that issue.

All four of the *Wilcox* elements are met when applied to the State Court's findings on the question of actual fraud. The State Court (1) issued its judgment on August 17, 2021, determining that fraud did not exist, after a bench trial before a magistrate who considered the Ohio common law fraud elements; (2) the claim of fraud was directly litigated (State Court complaint Count III) before the magistrate; (3) the parties in this case are the same as the parties before the State Court; and (4) Catanzarite, the party against whom estoppel is sought here, was a party in the State Court. Therefore, collateral estoppel applies to the actual fraud element.

### D. Distinguishing False Representation and False Pretenses Under § 523(a)(2)(A)

The terms "false representation," and "false pretenses" are not explicitly defined in the Code, but the Supreme Court has dictated that "[t]hey are common-law terms, and . . . imply elements that the common law has defined them to include." *Field v. Mans*, 516 U.S. 59, 69 (1995). Under § 523(a)(2)(A), courts have found that both "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Baker v. Wentland (In re Wentland)*, 410 B.R. 585, 594 (Bankr. N.D. Ohio 2009) (quoting *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983)). There are

13

distinctions between false representations and false pretenses.  The court in *Wentland* explained that false pretenses are distinguishable from a false representation in that a "[f]alse pretense involves an *implied* misrepresentation or conduct that is intended to create and foster a false impression while a false representation involves an *express* representation."  410 B.R. at 594 (emphasis added); *see also Coughlin Chevrolet, Inc. v. Thompson (In re Thompson)*, 458 B.R. 409, 421 (Bankr. S.D. Ohio 2011).  Stated differently, "the element distinguishing a false representation from a false pretense is an explicit, definable statement by the debtor that results in a misrepresentation."  *Argento v. Cahill (In re Cahill)*, No. 15-08298, 2017 WL 713565, at *6 (Bankr. E.D.N.Y. Feb. 22, 2017).

### E.  False Representation Under § 523(a)(2)(A)

In order to except a debt from discharge pursuant to false representation under § 523(a)(2)(A), a creditor must prove the following four elements: "(1) the debtor obtained money through a[n] [*express*] material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss."  *In re Rembert*, 141 F.3d at 280–81 (emphasis added).  To form the basis of a false representation, a debtor-promisor's representation (such as a lack of intent to perform under the contract) must exist at the time the contract was executed.  *See Siebanoller v. Rahrig (In re Rahrig)*, 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007).  A breach of contract or breach of promise, alone, cannot be the basis for nondischargeability under § 523.  *Risk v. Hunter (In re Hunter)*, 535 B.R. 203, 213 (Bankr. N.D. Ohio 2015) ("A broken promise alone will not establish the existence of any intent to deceive.").  Instead, the false representation must be one of an existing fact.  *Id.*

14

*1. Wilcox Analysis for False Representation*

The elements Rewak must prove to establish his § 523(a)(2)(A) false representation claim are nearly identical to those that he was required to prove in State Court to obtain a judgment for common law fraud under Ohio common law. *Compare In re Rembert*, 141 F.3d at 280–81 (establishing that a false representation analysis consists of considering whether the debtor "obtained money through an [express] material misrepresentation that . . . the debtor knew was false or made with gross recklessness as to its truth . . . the debtor intended to deceive . . . the creditor justifiably relied on the false representation, and . . . its reliance was the proximate cause of the loss") *with Gaines*, 514 N.E.2d at 712 (establishing that a fraud analysis consists of considering whether there was "a representation" which is "material to the transaction at hand . . . made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to where it is true or false that knowledge may be inferred, . . with the intent of misleading another into relying upon it . . . justifiable reliance upon the representation or concealment, and . . . a resulting injury proximately caused by the reliance").

*2. Collateral Estoppel Applies*

As for the *Wilcox* elements, the Court has already determined that elements one and four have been met: (1) there was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue, and (4) the parties in the State Court were the same parties before the Court in this case. That leaves elements two and three. "[T]he issue must have been actually and directly litigated in the prior suit and must have been necessary in the final judgment[,]" and the issue in the current case must be "identical to the issue in the prior suit." *In re Wilcox*, 229 B.R. at 415–16. The Court finds that the elements of false representation under § 523(a)(2)(A) were actually and directly litigated at the State Court because false representation

15

under § 523(a)(2)(A) and fraud under the Ohio common law asks courts to consider overlapping issues, i.e., whether there was an express material representation, made falsely or recklessly, with the intent to deceive, in which the creditor relied, and thereby suffered a loss.

Therefore, because the common law fraud claim asserted by Rewak in State Court was predicated on *express* false representations by Catanzarite, the State Court's "no fraud" finding necessarily precludes a determination by this Court of nondischargeability based on false representation under § 523(a)(2)(A). Therefore, collateral estoppel applies to the false representation claim, and the Court is estopped from determining that issue.

### 3. False Pretenses Under § 523(a)(2)(A)

"False pretense involves implied misrepresentation or conduct intended to create and foster a false impression. . . ." *In re Wentland*, 410 B.R. at 594 (citation and internal quotation marks omitted). False pretense means "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property." *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000). Moreover, "[t]he term has been defined as '[u]sually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposefully create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor.'" *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996) (internal citation omitted).

In order to establish a debt is nondischargeable under false pretenses, a plaintiff must prove elements similar to those required to prove false representation. The small, but meaningful, difference between a false pretense and a false representation is a false pretense only requires an *implied* material misrepresentation, rather than an express one. To prevail under false pretenses, a plaintiff must prove: "(1) the debtor obtained money through a[n] [*implied*]

16

material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *In re Rembert*, 141 F.3d at 280–81 (emphasis added); *see also Giglio v. Nisivoccia (In re Nisivoccia)*, 502 B.R. 139, 156 (Bankr. E.D.N.Y. 2013) (indicating that the distinguishing factor for a false pretenses claim under § 523(a)(2)(A) is an *implied* misrepresentation).

  *1. Wilcox Analysis for False Pretenses*

  The Court finds that collateral estoppel does not apply to preclude the Court's dischargeability determination based on Rewak's claim of false pretenses. Although elements one (final judgment on the merits after a full and fair opportunity to litigate) and four (matching parties) are met, elements two and three are not. The issue of false pretenses was not actually and directly litigated in the State Court. False pretenses, is "the product of multiple events, acts or representations undertaken by a debtor which purposefully create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor." *In re Soliz*, 201 B.R. at 369. Fraud requires "a[n] [express] representation . . . which is material to the transaction at hand . . . made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to where it is true or false that knowledge may be inferred . . . with the intent of misleading another into relying upon it . . . justifiable reliance upon the representation or concealment, and . . . a resulting injury proximately caused by the reliance." *Gaines*, 514 N.E.2d at 712. Necessarily then, false pretenses are not "identical" to fraud. Therefore, collateral estoppel does not apply because the issue of false pretenses was not actually and directly litigated at the State Court.

As stated above, the parties do not dispute that any of the Transactions occurred, nor the purpose of them. Therefore, the lone issue remaining for the Court to determine is whether Catanzarite obtained the Transactions from Rewak by false pretenses. The Court addresses and decides the nature of each of the five Transactions.

> i.    *March 2006 – The Auto Insurance Payment*

The first transaction was a $1,200.00 check Rewak made payable to Catanzarite to help with Jones' "payments of [auto] insurance" on March 10, 2006. Trial Tr. 22:19. Rewak introduced evidence in the form of a letter from LorMet Community Credit Union referencing a $1,200.00 check made out by Rewak on that date. Pl.'s Ex. 201. Rewak generally testified that it was his understanding that he "was going to be repaid by [Jones] through whatever source she had" (Trial Tr. 24:12–13) and that "[Catanzarite] was going to go through the [T]rust. . . ." *Id.* 24:25–25:1.

Catanzarite briefly testified about the Auto Insurance Payment, stating Jones "needed car insurance. . . . It was just insurance I had to get, and [Rewak] offered to give me the money for it." *Id.* 74:21–23.

After hearing testimony, the Court finds that Rewak has not met his burden of proving the Auto Insurance Payment is excepted from discharge under § 523(a)(2)(A) by a preponderance of the evidence. Rewak offered nothing specific as to the existence of an agreement, repayment plan, or anything of the sort between him and Catanzarite. Moreover, there was not sufficient testimony or evidence that demonstrated Catanzarite conducted herself in a manner as to create a false impression of repayment. Nor was there any testimony or evidence that demonstrated Catanzarite intended to deceive Rewak in this instance. The testimony surrounding the Auto Insurance Payment was vague. Rewak issued a check payable to

18

Catanzarite, but it appears as though Jones was the beneficiary of the Auto Insurance Payment, and Jones was to repay Rewak, not Catanzarite. Therefore, the Court is unable to make the finding that Catanzarite obtained money through an implied material misrepresentation that at the time she knew was false or made with gross recklessness to its truth. As to the Auto Insurance Payment, false pretenses were not proven by a preponderance of the evidence, therefore the Court finds the Auto Insurance Payment to be dischargeable.

ii.    *August 2006 – The First Dental Payment*

On August 9, 2006, Rewak issued a $6,400.00 check payable to Catanzarite "to pay a credit card charge for veneers." Trial Tr. 25:17. On direct, Rewak testified that he "had no knowledge" that Catanzarite was planning on getting veneers, that "it was like a surprise when she came to visit . . . and the procedure was already done." *Id.* 26:1–4. Rewak continued:

> In our conversation that evening came about that it was put on a credit card. . .
> I spoke to her that I didn't think it was the right direction to go because of the
> interest rates to pay off such an amount of money on a credit card. . . [A]t that
> initial conversation, I brought up the item of that I would give her a personal
> loan to pay the credit card off at zero interest, so . . . a hardship would[n't] be
> created on her. . . .

*Id.* 26:7–9, 20–24.

According to Rewak, the repayment plan was that "eventually when [Jones] became of age to collect money out of her [T]rust fund it would be paid out of there." *Id.* 27:13–15. Rewak stated he "was not worried because [he] knew there was money. . . ." *Id.* 28:8–9. Rewak further testified that "[a]t the time" Catanzarite "didn't accept" his offer to pay her credit card off. *Id.* 27:1–2. For her part regarding the First Dental Payment, Catanzarite testified "that was a gift from him to me." *Id.* 75:10.

Rewak has not met his burden of proving that the First Dental Payment is excepted from discharge under § 523(a)(2)(A) by a preponderance of the evidence. Rewak did not offer

19

sufficient testimony for the Court to find an implied misrepresentation or an intent to deceive on the part of Catanzarite. In fact, Rewak's own testimony (that he was surprised to find Catanzarite already had the procedure done and that Catanzarite initially objected to his financial assistance) casts doubt on the notion that Catanzarite misled Rewak in an attempt to induce him to pay the First Dental Payment. As to the First Dental Payment, false pretenses were not proven by a preponderance of the evidence. Therefore, the Court finds the First Dental Payment to be dischargeable.

### iii. March 2007 – The Second Dental Payment

On March 20, 2007, Rewak issued a check payable to Catanzarite in the amount of $2,000.00 "for additional dental work she needed done." *Id.* 29:4–5. Rewak testified that Catanzarite "once again, asked . . . that she needed some funds to take care of that, because the dental office was not giving her a credit line whatsoever." *Id.* 29:10–13 (cleaned up). Rewak did not testify with particularity regarding the Second Dental Payment. At this time, Rewak had issued three checks payable to Catanzarite (the Auto Insurance Payment, the First Dental Payment, and the Second Dental Payment). According to Rewak "it was all bundled together, and [his] understanding was [Catanzarite] spoke to her daughter and said that when she became of age to collect . . . that it would be paid out of the [Trust] to be at zero percent." *Id.* 29:17–22. To that end, Rewak stated that the parties "talk[ed] about what the total [was]." *Id.* 30:3.

Catanzarite offered no meaningful testimony as it relates to the Second Dental Payment—maintaining only that it was a gift. *Id.* 85:12–14.

Rewak did not offer sufficient testimony or evidence for the Court to find false pretenses by a preponderance of the evidence. Although Rewak's testimony indicates that Catanzarite approached him regarding the Second Dental Payment, he did not offer sufficient testimony that

20

demonstrated an implied misrepresentation by Catanzarite. There was no testimony as to Catanzarite's knowledge or recklessness as to the truth of her supposed representations. There was no testimony as to Catanzarite's intent to deceive Rewak in this instance. Even though Rewak's testimony demonstrated the parties discussed how he would be repaid, there was no testimony or evidence presented that leads the Court to find that Catanzarite had no intention of following through on the arrangement. As to the Second Dental Payment, false pretenses were not proven by a preponderance of the evidence. Therefore, the Court finds the Second Dental Payment to be dischargeable.

<em>iv. September 2007 – The Real Estate Payment</em>

On September 1, 2007, Rewak issued a check payable to Catanzarite in the amount of $25,000.00. Pl.'s Ex. 205. According to Rewak, the purpose of the payment was for a "possible real estate venture that [Kalo] wanted to start by purchasing a residential property." Trial Tr. 32:2–3. Rewak testified that Catanzarite said "more funds" were needed "to do extensive renovation to the home." *Id.* 32:19–22. On direct, Rewak was asked: "did [] Catanzarite say to you the $25,000.00 amount?" *Id.* 34:7–8. Rewak replied: "[t]hat's how it came out" (*Id.* 34:9) and further stated that Catanzarite "came to [him] for the money because they didn't want to go to the [T]rust, at that time." *Id.* 34:17–19.

Regarding repayment, Rewak testified that "the repayment would come back to [him] when [Catanzarite's] daughter [(Jones)] would reach the age of being able to take money out of the fund. . . ." *Id.* 34:24–35:2. Rewak also introduced into evidence an "IOU" dated September 1, 2007. Pl.'s Ex. 204. The IOU, made out to Rewak, is in the amount of $25,000.00, plus six percent interest and includes two signatures: Catanzarite and Jones. *Id.* Rewak testified that Catanzarite and Jones wrote the IOU and that "it was given to [him] through [Catanzarite]."

21

Trial Tr. 31:7, 10. Rewak explained that Catanzarite later "came back to [him] in the second conversation of the $25,000.00 [Real Estate] repayment and previous monies where [she] did not want to go to the [Trust], because of the financial hardship it would create. . . ." *Id.* 43:14–18.

On cross examination, when Catanzarite was asked whose handwriting the IOU was in, she replied, "it's mine." *Id.* 75:24. She confirmed that "the loan was for the house," specifically to do repairs on the house. *Id.* 76:5–8. Further, counsel asked Catanzarite if "the goal was that [Rewak] would be paid back once [Jones] had access to that [T]rust in 2008." *Id.* 77:8–10. Catanzarite responded: "Yes." *Id.* 77:11. Counsel asked: "at the time of giving [the IOU], there was clearly a discussion about the [T]rust being in place, correct?" *Id.* 80:7–9 (cleaned up). Catanzarite: "Yes." *Id.* 80:10.

When asked if it was her argument that Rewak "had no reliance on this [T]rust or the monies in the [T]rust. . ." (*Id.* 79:5–7), Catanzarite responded, "[w]e never discussed the [T]rust." *Id.* 79:8. As a result of inconsistencies in her testimony and her demeanor, the Court finds Catanzarite to be a minimally credible witness.

The Court finds that Rewak has met his burden of proving the Real Estate Payment is excepted from discharge under false pretenses by a preponderance of the evidence. The parties had specific conversations about the Real Estate Payment and the availability of the Trust as a means to reimburse Rewak. Together with the "IOU," the Court determines that the parties' discussions about the Trust, Catanzarite's insinuations of repayment based on her ability to access the Trust, and her past conduct, constitutes a series of communications which, when considered collectively, created and fostered in Rewak a false and misleading understanding that he would be repaid. Rewak was wrongfully induced to advance the Real Estate Payment, and Catanzarite misled him knowingly and willfully. The Court finds Rewak's reliance on the

existence of the Trust as a means of repayment to be the result of Catanzarite's multiple representations to create, purposefully, a misleading understanding that she could – and would – repay Rewak. Rewak's reliance was the proximate cause of his loss. Rewak's testimony, that without his belief that Catanzarite had a ready source of funds, he would not have made the Real Estate Payment, is highly credible. The Court further finds Rewak's belief in the existence of the Trust to be credible. False pretenses were proven by a preponderance of the evidence. Therefore, the Court finds the Real Estate Payment to be nondischargeable.

> v.      *March 2010 – The Lincoln Mercury Payment*

The last transaction in question occurred on March 16, 2010. Rewak issued a check payable to Liberty Auto Group in the amount of $23,345.87. Pl.'s Ex. 206. Rewak stated the check was "the full payment" to purchase a 2010 Mariner automobile for Catanzarite. Trial Tr. 37:3–5. Rewak considers the Lincoln Mercury Payment to be "a personal loan." *Id.* 38:6. At the Trial, Rewak explained his recollection of the meeting at the dealership when the vehicle was purchased:

> During the negotiations and conversations with [Catanzarite] . . . she was talking about loans, and she never applied for any auto loan, but it came up during our negotiations that if I paid cash they gave us a much, gave [her] a much better financial package to purchase it.
>
> . . .
>
> It was agreed upon because of the financial package from the dealership that she would accept the loan for me and repay me. . . . Initially, she told me she can afford $300.00 a month payment.

*Id.* 38:8–14, 17–23 (cleaned up).

Rewak paid for the vehicle, and Catanzarite drove it home that same day. Rewak testified that "a few months or so after the purchase no payment was being made. . . ." *Id.* 39:8–9. Rewak confronted Catanzarite about this, asking: "[w]hat's going on[?]. You promised you would pay me $300.00 a month. . . ." *Id.* 39:12–13. He further testified that "there was some

discussion that happened" and "$500.00 payment came to me that evening or the next day, and then two more payments of $500.00 came to me." *Id.* 39:17–19. The parties continued to have discussions regarding the repayment of the funds. Rewak testified that the parties discussed the Trust as a source of repayment, stating Catanzarite had informed him that she and Jones "controlled it, and they could do what they want with it." *Id.* 40:25–41:1. Rewak testified that Catanzarite did not want to draw funds from the Trust at that time due to the "stock market situation" (even though her daughter controlled the Trust at this point). *Id.* 41:4–5.

Regarding the Lincoln Mercury Payment, Catanzarite testified only that "it started out as a loan" but did not testify further in a meaningful way. *Id.* 81:13.

The Court finds, by a preponderance of the evidence, false pretenses exist as to the Lincoln Mercury Payment. Rewak's testimony about the $300.00 payment arrangement, together with the parties' past discussions of the Trust as a source of repayment, created and fostered the false impression that Rewak believed he would be repaid. The Court finds that, because Catanzarite made no effort to make the $300.00 payments for "a few months" immediately after receiving the vehicle, and offered no explanation as to why, she did not intend to repay the Lincoln Mercury Payment. Catanzarite obtained the vehicle through her implied material misrepresentations to Rewak that she could afford to make monthly payments or repay him in full from the Trust. The Court finds that Catanzarite intended to create and foster the false impression of repayment. The Court also finds that Rewak justifiably relied on the false impression Catanzarite created. Rewak's reliance was the proximate cause of his loss. In advancing the Lincoln Mercury Payment, and because only $1,500.00 of the $23,345.87 was repaid, he suffered a loss of $21,845.87. False pretenses were proven by a preponderance of the

evidence.  Therefore, the Court finds the Lincoln Mercury Payment to be nondischargeable in the amount of $21,845.87.

**<u>CONCLUSION</u>**

For the foregoing reasons and pursuant to 11 U.S.C. §§ 523(a)(2)(A), the Court finds that the debt of Catanzarite to Rewak is hereby determined to be nondischargeable in the amount of $46,845.87.

**IT IS SO ORDERED**.